# IN THE COURT OF APPEALS OF IOWA

No. 19-0285
Filed July 22, 2020

IN RE THE MARRIAGE OF ROBERT SCOTT DARRAH
AND JAN RENEE DARRAH

Upon the Petition of
**ROBERT SCOTT DARRAH,**
        Petitioner-Appellant,

**And Concerning**
**JAN RENEE DARRAH,**
        Respondent-Appellee.

_____

        Appeal from the Iowa District Court for Pottawattamie County, Kathleen A.

Kilnoski, Judge.


        Robert Darrah appeals and Jan Darrah cross-appeals from the decree

dissolving their marriage. **AFFIRMED AS MODIFIED.**


        Andrew B. Howie of Shindler, Anderson, Goplerud & Weese, P.C., West

Des Moines, for appellant.

        J. Joseph Narmi, Council Bluffs, for appellee.


        Heard by Tabor, P.J., and May and Greer, JJ.

**MAY, Judge.**

Robert (Scott)[1] Darrah appeals and Jan Darrah cross-appeals from the decree dissolving their marriage. We affirm with one narrow modification.

**I. Facts and Prior Proceedings**

Scott and Jan met while attending Creighton University. Both graduated with business degrees. They married in 1990. They had three children, R.D. in 2001, and twins M.D. and A.D. in 2004.

In the first few years of the marriage, the couple moved between Nebraska and Iowa as Scott pursued his career. In 2005, the two settled in Council Bluffs and bought a home, though only Scott is listed on the mortgage.

Scott developed his franchise business with Ameriprise, providing services such as financial planning, estate planning, investment assistance, and retirement planning. Some years Jan out-earned Scott.[2] But she left the workforce in 2005— shortly after giving birth to the twins in 2004. In 2012, Jan began working as a para-educator once the twins began first grade.

By 2007, Scott earned more than $100,000 per year. And by 2013, Scott earned more than $200,000 per year. And his business took off from there.[3]

---

[1] Robert goes by his middle name, Scott.

[2] Jan managed an eye care clinic for a period and then worked as an account manager for AT&T. While at AT&T, she earned her highest annual pay, $63,273, in 2004.

[3] Scott's income was difficult for the district court to ascertain from the documentation Scott provided. For purposes of setting child support, the court imputed Scott with an annual income of $325,000.

But Scott and Jan had disagreements about their finances. Scott thought Jan overspent. He put Jan on an $1100 a month allowance. Jan felt the allowance was just a means for Scott to exert control over her.

In 2016, Scott filed for dissolution of marriage. As part of the temporary matters, the district court required the couple to open a joint bank account in which Scott would deposit $10,000 and then replenish when the balance reached $5000. These funds served as temporary spousal support and temporary child support for Jan.

Scott continued to pay the mortgage on the marital home. A September 2017 temporary order provided the couple would alternate weekly stays at the marital home while the children lived in the home. The temporary order also provided that Scott would pay for Jan's hotel accommodations during weeks she was to vacate the home.

The matter came for trial over three days in October 2019. Scott alleged Jan's spending of $174,000 in the joint account intended as temporary spousal and child support amounted to dissipation of assets. So he requested those funds to be considered an asset for purposes of the property division. The court declined to do so, citing to Jan's testimony about how the funds were spent for legitimate purposes. The court's decree divided numerous accounts and other assets between the parties, including awarding Jan the marital home and a bank account with a balance of $81,612 (the Nexus account). The court also ordered Scott pay Jan a property settlement award of $521,211 in $4343 monthly installments over

the course of ten years. And the court awarded Jan traditional spousal support in the amount of $4000 per month until either party dies or Jan remarries.[4]

Both parties filed motions to enlarge or modify the decree. The court amended the decree, increasing the equalization payment to $546,211.05 to be paid in monthly installments of $4552 over ten years. The court also ordered that, once Scott paid Jan the value of the Nexus account ($81,612), Jan would have 120 days to refinance the martial home to remove Scott from the mortgage.[5] The decree provided interest on the $81,612 would accrue at a rate of 4.86% until payment is satisfied.

Scott now appeals, and Jan cross appeals.

## II. Scope and Standard of Review

Dissolution proceedings are reviewed de novo. *In re Marriage of McDermott*, 827 N.W.2d 671, 676 (Iowa 2013). However, we afford deference to the district court's factual findings, "particularly when considering the credibility of witnesses, but we are not bound by them." *In re Marriage of Fox*, 559 N.W.2d 26, 28 (Iowa 1997). We will only "disturb the district court's 'ruling only where there has been a failure to do equity.'" *McDermott*, 827 N.W.2d at 676 (citation omitted); *see also In re P.C.*, No. 16-0893, 2016 WL 4379580, at *2 (Iowa Ct. App. Aug. 17, 2016) (identifying "reasons to exercise 'de novo review with deference,' including: notions of judicial comity and respect; recognition of the appellate court's limited

---

[4] The district court also ordered Scott pay Jan child support: $3085 monthly for three children; $2717 monthly for two children; and $1925 monthly should only one child be eligible for support. The child support award is not at issue in this appeal.
[5] The court amended the decree to award Jan the value of the Nexus account rather than the account itself.

function of maintaining the uniformity of legal doctrine; recognition of the district court's more intimate knowledge of and familiarity with the parties, the lawyers, and the facts of a case; and recognition there are often undercurrents in a case— not of record and available for appellate review—the district court does and should take into account when making a decision").

**III. Discussion**

**A. Property Division**

*1. Asset Dissipation*

We first address the distribution of property. Scott renews his claim that Jan dissipated $174,000 by spending money in the joint account intended to serve as temporary spousal and child support. He claims the funds were spent on tangible assets that Jan continues to possess. So, he contends the dissipated amount should be included as an asset for purposes of the property distribution.

A party dissipates assets when their[6] conduct "results in the loss or disposal of property otherwise subject to division at the time of divorce." *In re Marriage of Kimbro*, 826 N.W.2d 696, 700–01 (Iowa 2013) (citation omitted). "However, the doctrine does not apply if the spending spouse used the monies for 'legitimate household and business expenses.'" *Id.* at 701 (citation omitted).

We review dissipation claims using a two-pronged test. *Id.* The first prong "require[s] sufficient evidence of the spouse's expenditures." *Id.* at 702. This includes itemizations of the expenditures and a nexus between the expenditures and use of the marital asset at issue. *See id.* at 701. Once "a spouse claims the

---

[6] This opinion will use "they" and "their" as gender-neutral pronouns.

other party dissipated assets and can identify the assets allegedly dissipated, the burden shifts to the spending spouse to 'show how the funds were spent or the property disposed of by testifying or producing receipts or similar evidence.'" *Id.* (citation omitted).

If the first prong is met, then we move to the second prong, which determines "whether that purpose amounts to dissipation under the circumstances." *Id.* (citation omitted). In determining whether expenditures amount to dissipation, we consider four factors:

> (1) the proximity of the expenditure to the parties' separation, (2) whether the expenditure was typical of expenditures made by the parties prior to the breakdown of the marriage, (3) whether the expenditure benefited the "joint" marital enterprise or was for the benefit of one spouse to the exclusion of the other, and (4) the need for, and the amount of, the expenditure.

*Id.* (citation omitted).

Here, we have itemizations of the expenses coming from the joint account. This satisfies the first prong of our test. But Scott's claim falls apart on the second prong. While these expenditures occurred during the pendency of these proceedings, they do not amount to dissipation.

This case presents a unique scenario that does not fit neatly into our test at first glance. The funds in the account were there to serve as temporary spousal and child support. And the expenditures reflect those one might expect from a parent raising three teenage children.[7] The charges show Jan bought groceries,

---

[7] We note several of the larger charges were associated with Jan's hotel stays while Scott exercised his parenting time in the home in accordance with their temporary week-on/week-off physical care schedule, and the court ordered Scott to pay for those hotel stays.

made her car and auto-insurance payments, paid dental bills for the family, paid medical bills, paid fees to schools and dance studios for the children, paid veterinarian bills, bought some material items at places like Wal-Mart and Von Maur, and dined out. Critically, these expenditures appear to be in line with expenditures made by Jan prior to the breakdown of the marriage. In fact, at trial Scott complained that Jan had a long history of shopping, and their differing approaches to finances appears to be a catalyst to the breakdown of the marriage.

And use of these funds benefitted both parties in a sense. Jan was able to maintain her standard of living and pay expenses relating to the children, and Scott was not required to make separate temporary spousal and child support payments. Moreover, Scott does not parse out what expenses account for the "clothing, appliances, etc.," he believes "still existed at the time of trial" and amount to dissipation. Nor has he shown what spending was excessive as temporary spousal and child support. So we find Jan did not dissipate assets.

*2. Household Contents*

Next, Scott claims the district court undervalued household goods Jan received. The court valued the items at $18,000 as Jan testified, but Scott claims they are worth $50,000. Yet in the dissolution decree, the court expressly found Jan's testimony regarding the household items to be more credible, particularly when combined with photos Scott provided. But Scott claims the court should not have credited Jan's testimony because the following exchange at trial between Jan and her attorney shows she does not know how to value property:

> Q. Then we got the household contents and appliances. We got appliances, furniture, and items in storage. Do you see that? A. Yep.

*Q. And what did you value those things at? A. I don't understand value.*

(Emphasis added.) But reviewing the questioning in context shows Jan did not mean she did not understand how to determine the value of the items. Rather, a more reasonable interpretation of her response is that she did not understand what her counsel was referencing at the time of the question. Counsel followed up by clarifying, "What's the value on the financial affidavit?" Jan then answered and discussed the condition and age of items in the home. So we do not take issue with the district court crediting Jan's testimony. And we defer to the district court's determination that Jan's testimony on the value of the household items was more credible. *See Fox*, 559 N.W.2d at 28 (noting we often defer to the district court's factual findings when assessing witness credibility). So we do not disturb its valuation of the household contents.

*3. Children's Life Insurance Policies*

Scott claims the district court should have awarded him sole ownership of the children's life insurance policies rather than awarding them jointly to both Jan and himself. He claims he has superior knowledge of how to manage the policies and can teach the children how to manage the policies better. But Scott can still educate the children on policy management while sharing policy ownership with Jan. And he can use his expertise to manage the accounts as well. While Jan will have to sign off on any changes, we have no reason to believe she would not agree to something that serves everyone's best interests.

The district court's decision to jointly award the children's life insurance policies to both Scott and Jan was not inequitable. We will not disturb it.

*4. Payment for Nexus Account*

On cross-appeal, Jan argues there should be a reasonable deadline for Scott to satisfy the $81,612 award for the value of the Nexus account. She notes this payoff is a triggering event in the decree: it requires her to refinance the marital home within 120 days of payment. At oral argument, Scott's counsel agreed there should be a definitive deadline for payment of the $81,612. We agree. So we modify this provision of the decree to order Scott to pay Jan the $81,612 within ninety days of the issuance of procedendo.

**B. Spousal Support**

Both parties appeal the spousal support award. Scott agrees he should pay spousal support but argues he should pay $3000 per month for three years and then $2000 per month until Jan reaches age sixty-seven, either party dies, or Jan remarries. Jan argues the district court's award—$4000 per month until either parties' death or her remarriage—is insufficient. She requests $10,000 per month, presumably until either parties' death or her remarriage.

"The question of whether to award alimony is a matter of discretion and not a matter of right. The district court has 'considerable latitude' in fashioning or denying an award of spousal support." *In re Marriage of Mann*, 943 N.W.2d 15, 20 (Iowa 2020) (citations omitted). Iowa Code section 598.21A(1) (2016) sets out factors for the court to consider when fashioning an award. They include:

> a. The length of the marriage.
> b. The age and physical and emotional health of the parties.
> c. The distribution of property made pursuant to section 598.21.
> d. The educational level of each party at the time of marriage and at the time the action is commenced.

e. The earning capacity of the party seeking maintenance, including educational background, training, employment skills, work experience, length of absence from the job market, responsibilities for children under either an award of custody or physical care, and the time and expense necessary to acquire sufficient education or training to enable the party to find appropriate employment.

f. The feasibility of the party seeking maintenance becoming self-supporting at a standard of living reasonably comparable to that enjoyed during the marriage, and the length of time necessary to achieve this goal.

g. The tax consequences to each party.

h. Any mutual agreement made by the parties concerning financial or service contributions by one party with the expectation of future reciprocation or compensation by the other party.

i. The provisions of an antenuptial agreement.

j. Other factors the court may determine to be relevant in an individual case.

Iowa Code § 589.21A(1).

Like the district court, we find an award of traditional spousal support to be appropriate in this instance. Traditional support is appropriate for long-term marriages where the earning potential of the parties is predictable. *In re Marriage of Gust*, 858 N.W.2d 402, 410 (Iowa 2015). It is justified in instances when one party manages the home at the expense of their own professional development or future prospects. *See id.*

The district court aptly stated, "Neither party could have the family life they shared without the contributions of the other." Scott was able to foster his professional life early on while Jan worked and out-earned him, and then he was able to excel professionally as Jan focused on their three accomplished children at the expense of her own professional development. And thanks to Scott's professional success, Jan has had the comforts of a beautiful lifestyle and flexibility to attend to her family.

We recognize Jan would not be able to continue to live in a reasonably comparable manner absent some type of spousal support. *See id.* at 411. Aside from her part-time job as a para-educator,[8] she has been absent from the professional workforce for about a decade and a half. She is now in her early fifties. She hopes to secure a full-time para-educator position or be able to substitute teach soon through a certification program. While both jobs would bring in measurable income, neither would come close to providing Jan with the income necessary to maintain her lifestyle.

Scott has an optimistic view of Jan's job prospects, suggesting she could attend school to obtain an education degree and make $57,870 per year. So he argues Jan's need for support is not so great given her future earning potential and the significant property award. But we note the district court considered the property award when fashioning the spousal support award. And while we hope Jan is successful in whatever position she pursues, it appears the district court did not think Scott's career plan for Jan is particularly realistic. Nor do we.

At the same time, we reject Jan's claim that she should receive $10,000 per month in spousal support. She does earn income from her current job. Plus she receives child support to help with costs associated with the children. And she is already receiving a significant property settlement, including an equalization payment of over half a million dollars paid over ten years, a chunk of Scott's deferred compensation, and a payment of $81,612 for the value of the Nexus

---

[8] When Jan started in 2012, she worked two days a week earning $10 or $10.75 an hour. She now works four days a week at $12.75 an hour. She testified she does not yet work as a full-time para-educator because there were no available full-time positions.

account within ninety days of the issuance of procedendo. Those resources—in addition to the $4000 monthly spousal support award—should provide Jan with a comparable lifestyle. We also note that due to recent changes to tax laws, spousal support payments are no longer tax deductible for the paying spouse and no longer taxable income for the recipient. *See Mann*, 943 N.W.2d at 21. This will result in an additional burden on Scott. And it will provide Jan with more cash overall.

While the spousal support award leaves both parties wanting, it was within the range of equity. We refuse to tinker.

### C. Appellate Attorney Fees

Both parties request appellate attorney fees. Appellate attorney fees are awarded upon our discretion and are not a matter of right. *See In re Marriage of Okland*, 699 N.W.2d 260, 270 (Iowa 2005). When considering whether to exercise our discretion, "we consider 'the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal.'" *McDermott*, 827 N.W.2d at 687 (quoting *Okland*, 699 N.W.2d at 270).

After review, we award Jan appellate attorney fees in an amount of $4000. Costs of this appeal are split equally between Scott and Jan.

## IV. Conclusion

We modify the dissolution decree to order Scott pay the $81,612 for the value of the Nexus account within ninety days of the issuance of procedendo. We affirm the property award in all other respects. We affirm the spousal support award. And we award Jan $4000 in appellate attorney fees. The parties shall split cost of this appeal equally.

**AFFIRMED AS MODIFIED.**