# IN THE COURT OF APPEALS OF IOWA

No. 21-0454
Filed March 30, 2022

IN RE THE MARRIAGE OF JASON DALE MILLS
AND ERINN ANN MILLS

Upon the Petition of
JASON DALE MILLS,
     Petitioner-Appellee,

And Concerning
ERINN ANN MILLS, n/k/a ERINN ANN PIERCE,
     Respondent-Appellant.

_____

Appeal from the Iowa District Court for Wapello County, Shawn Showers,

Judge.

A former wife appeals the denial of spousal support in a dissolution decree.

**AFFIRMED AS MODIFIED AND REMANDED.**

Ryan J. Mitchell of Orsborn, Mitchell, Goedken & Larson, P.C., Ottumwa,

for appellant.

Heather M. Simplot of Harrison, Moreland, Webber & Simplot, P.C.,

Ottumwa, for appellee

Considered by May, P.J., and Schumacher and Badding, JJ.

**BADDING, Judge.**

This case is a study in contradictions. In assessing Erinn Mills's request for spousal support in this fourteen-year marriage, the district court found she was credible in testifying that she could not work after an injury suffered while giving birth to the parties' only child in 2006. Yet the court determined spousal support was "not appropriate," in part because the court anticipated that Erinn would "either qualify for disability in due course or seek employment." Erinn appeals, claiming the court's refusal to award her spousal support was inequitable. We agree.

## I.     Background Facts and Proceedings

Erinn and Jason Mills married in May 2006. Just a few days before their marriage, the parties signed a prenuptial agreement that generally provided their present and future property would remain their separate property. In an attachment to the agreement, Erinn disclosed a number of assets, the most significant of which was anticipated proceeds from her grandfather's trust—the J.O. Sheets Trust. Erinn's share of that trust was valued "at about $208,348," with half of that amount to be distributed to her when she turned thirty and the balance at age thirty-five. Erinn also jointly owned a $140,000 four-acre farm with her mother, which included a house, Morton building, and small barn, against which a mortgage of $98,000 was owed.[1]

---

[1] Other assets included nine Arabian horses (valued together at $100,000) that Erinn owned jointly with her father, approximately $20,000 in horse-related gear, $25,000 in jewelry Erinn inherited from her grandmother, trophies from horse competitions, a $63,000 whole life insurance policy, and a $2000 painting Erinn owned with her brother.

Jason's premarital assets were more modest, the largest being a 2002 Harley Davidson he valued at $15,000, a $30,000 401(k) retirement account, and a house valued at $38,500, against which $32,000 was owed. Jason also listed several antiques, multiple collectible items, musical instruments, and many miscellaneous items of smaller value, like "[p]osters of various music icons" including Bob Dylan and Jimi Hendrix, and a Cheech & Chong album.

When the parties married, Jason had a bachelor's degree and was grossing $40,899 per year. Erinn did not complete college, but she obtained a phlebotomy certificate in 2005, which provided her with part-time employment at a lab where she grossed $7024 the following year. The couple lived in the house Erinn owned with her mother, who paid the taxes and insurance for the property until 2011 when Jason took over the payments.

Erinn and Jason's only child was born at the end of 2006. During his birth, Erinn heard a "horrible" pop, immediately following which she was in "excruciating pain." After the birth, she wasn't able to get dressed, go to the bathroom, or walk without assistance. She went undiagnosed for several weeks until a trip to a specialist in Iowa City determined that she had a "rupture of the pubic symphysis," or in layperson's terms, a rupture between two of her pelvic bones. Because the pain was unrelenting, Erinn sought further treatment at the Mayo Clinic. It was there she learned more details about her injury, specifically that while she was giving birth, "the left side of [her] pelvis broke away from the right in the front, and in doing so, it rotated, and it ripped [the] muscles and tendons." This rupture causes muscle spasms that irritate and inflame the sciatic nerve. Erinn received some short-term relief from treatments at the Mayo Clinic in the year after the birth,

but surgical repair was apparently not an option, so she has learned to live with the pain.

In an attempt to return to normal life, Erinn went back to work part-time as a phlebotomist about nine months after the injury. She generally worked from 5:00 a.m. until 8:30 a.m., although she was chronically late. Erinn explained that she "never knew from day to day getting up what [she] would feel like. So it just—it was very hard." Some days, according to Erinn, she "will wake up, and . . . literally have to roll onto the ground before [she] can stand up." Erinn eventually quit working in 2014, a decision she said Jason encouraged, though he denied that. The most that Erinn earned as a phlebotomist was $10,717. During this same time, while Erinn's employment was stagnant, Jason's income was on the rise. By the time of the trial in February 2021, he was earning $74,500 gross per year as a product manager for a manufacturing company.

After Erinn stopped working in late 2014, Jason's income paid for most, if not all, of the marital expenses, though it does not appear the parties lived extravagantly. Erinn described herself as "basically completely dependent on Jason" from that point on. She did, however, receive $200 to $300 per month in dividends from investments she made with the two distributions from her grandfather's trust. Erinn testified that she received the first distribution of $108,969.94 in 2008, and the second distribution of $122,754.33 in 2013. She used some of the proceeds from the first distribution to pay off the mortgage owed on the house. The rest was invested in various mutual funds, stocks, and securities, which were then transferred to her revocable trust, of which she was

the sole beneficiary and trustee. Erinn left most of the investments up to her father, who was a financial advisor.

Erinn also received some income from boarding horses, although she explained all of the horses that she boarded belonged to her father. Her receipts for boarding horses totaled $6400 in 2016; $5200 in 2017; and $3600 in 2018. Erinn stopped boarding in 2019 because her father's horses had gotten old, and he couldn't afford to pay her to board them any longer. By the time of the trial, Erinn only had two horses at her farm—a mare owned by her mother and a gelding owned by a friend.

Much of Jason's evidence at trial focused on his assertion that Erinn's family was "very wealthy" and would never let her want for anything. Erinn agreed that her parents had paid for some things, like the property taxes and insurance for the house she owned jointly with her mother and her cell phone bill. But she did not agree her family was wealthy. Erinn's father passed away in 2020, and Jason offered the report and inventory from his estate as an exhibit at trial. The total listed for the Iowa gross estate was $249,520.07, most of which came from Erinn's father's one-half share in joint tenancy property owned with her mother. Jason intimated Erinn was set to receive something from her father's estate even though Erinn's mother was its sole beneficiary. Jason also pointed out that Erinn is a remainder beneficiary of her mother's share of the J.O. Sheets Trust. But Erinn testified her brother also has a remainder interest, and there is no guarantee they'll receive any money from that trust. As Erinn explained, her mother is in her early seventies, and if she needs to go "to a nursing home, that trust fund is going to fund that. . . . That is there for her and her care."

The parties separated in August 2019, and Jason petitioned for dissolution that same month. Shortly after the separation, Jason withdrew $83,782.36 from his IRA, $30,000 of which he used as a down payment on a home. He took out a loan for the rest of the purchase price. In November, the parties stipulated to temporary joint physical care of their child, with Jason paying temporary child support of $428.35 per month along with various expenses in lieu of temporary spousal support.[2] Before trial, the parties entered into a partial stipulation agreeing to continue their joint-physical-care arrangement. They later agreed to a division of most of their assets and debts consistent with their prenuptial agreement,[3] which neither contested, leaving the main issue for trial Erinn's request for spousal support.

Trial was held over two days in February 2021. Jason testified that if he did not have to pay spousal support for Erinn, he would assume responsibility for the $10,643.58 debt on Erinn's vehicle. Erinn testified that, absent an award of spousal support, she would have to live off of her trust, which would be quickly

---

[2] The temporary stipulation noted Jason had already paid for property taxes for Erinn's home; would pay for an outstanding medical bill; and would cover ongoing monthly expenses for Erinn's vehicle, vehicle insurance, propane, electricity, water, and internet. Those ongoing monthly expenses totaled $889.50.

[3] Pursuant to the prenuptial agreement, Erinn was awarded the premarital four-acre farm along with her trust and its assets, while Jason was awarded the Harley Davidson motorcycle and a $50,070.89 IRA he owned before the marriage. For joint assets accumulated after the marriage, the parties agreed that Erinn would receive a tractor mower Jason valued at $7500 and her 2015 Subaru Outback, although they disagreed about the responsibility for the debt owed on it. Jason was to receive his 2012 Dodge Ram, against which no debt was owed, and all personal property set forth on a list admitted at trial as Exhibit 20. Jason also agreed to pay a credit card in his name in the amount of $7643.73. And he received the home he purchased after the parties' separation, along with its debt.

depleted.  Erinn asked for $2000 in monthly spousal support, in addition to Jason continuing to make her monthly vehicle payment of $460 for her.

In the dissolution decree that followed the trial, the district court found Erinn's evidence that she could no longer work credible.  But then the court denied her request for spousal support, reasoning "that Erinn will either qualify for disability in due course or seek employment.  If Erinn is eligible for disability, then she is also eligible for Medicaid."  Because Jason was "paying the balance of" the marital debt, and Erinn "possesses significantly more assets" than Jason with no mortgage or car payments, the court found she would be "able to support a standard of living reasonably comparable to that enjoyed during the marriage without [spousal support]."

## II.    Analysis

In arguing the district court's denial of her request for spousal support was inequitable, Erinn highlights her inability to work, the disparity in the parties' incomes, and the length of the marriage.  She argues that, based on these factors, she was entitled to a traditional spousal support award of $2000 per month for life.

We start with the premise that spousal support

> is a stipend to a spouse in lieu of the other spouse's legal obligation for support.  [Spousal support] is not an absolute right, and an award thereof depends upon the circumstances of a particular case.  When making or denying an . . . award, the trial court considers the factors set forth in Iowa Code section [598.21A(1) (2019)].  Although our review of the trial court's award is de novo, we accord the trial court considerable latitude in making this determination and will disturb the ruling only when there has been a failure to do equity.

*In re Marriage of Olson*, 705 N.W.2d 312, 315 (Iowa 2005) (citation omitted). In this case, after considering the applicable factors, we find there has been a failure to do equity.

Jason initially relies upon the length of the marriage in arguing the district court correctly found traditional spousal support is not appropriate. *See In re Marriage of Gust*, 858 N.W.2d 402, 411 (Iowa 2015) (noting marriages lasting twenty years or more "merit serious consideration for traditional spousal support"). "While *Gust* referred to twenty years as the 'durational threshold' for 'serious consideration for traditional'" spousal support—a threshold this fourteen-year marriage falls short of—"we do not understand that statement as creating a bright-line test." *In re Marriage of Arevalo*, No. 16-1326, 2017 WL 4050076, at *3 (Iowa Ct. App. Sept. 17, 2017); *accord In re Marriage of Pazhoor*, ___ N.W.2d ___, ___, 2022 WL 815293, at *9 (Iowa 2022) ("Marriages lasting twenty years or more are generally considered long-term; however, that is not required." (internal citations omitted)); *In re Marriage of Ware*, No. 17-1397, 2018 WL 4360922, at *4 (Iowa Ct. App. Sept. 12, 2018); *In re Marriage of Nelson*, No. 15-0492, 2016 WL 3269573, at *3 (Iowa Ct. App. June 15, 2016). "We have affirmed awards of traditional spousal support in marriages shorter than twenty years . . . ." *Arevalo*, 2017 WL 4050076, at *3; *see also In re Marriage of Kohorst*, No. 19-0147, 2020 WL 564934, at *5 (Iowa Ct. App. Feb. 5, 2020) (collecting cases). This is because the length of the marriage is but one factor among many "to consider in the multifactor statutory framework." *Nelson*, 2016 WL 3269573, at *3.

Other relevant factors include: (1) the age and health of the parties, (2) the property distribution, (3) the educational level of each party, (4) the parties' earning

capacities, (5) the feasibility of the spouse seeking maintenance to become self-supporting at a standard of living reasonably comparable to that enjoyed during the marriage; and (6) the tax consequences. Iowa Code § 598.21A(1). The focus in assessing a request for traditional spousal support, which is "payable for life or so long as a spouse is incapable of self-support," *Olson*, 705 N.W.2d at 316 (citation omitted), is "primarily predicated on need and ability." *Gust*, 858 N.W.2d at 411 (citation omitted). The "yardstick" for measuring need mirrors one of the statutory factors for an award of spousal support, that is "the ability of a spouse to become self-sufficient at 'a standard of living reasonably comparable to that enjoyed during the marriage.'" *Id.* (quoting Iowa Code § 598.21A(1)(f)). We look at the "earning capability of the spouses, not necessarily on actual income" in determining need. *Id.*

By the time of the trial, Erinn was forty-two years old and had not worked in any capacity for seven years. Before then, she worked only three-and-a-half hours per day and even that was tough for her. Erinn testified that she did not believe she could ever go back to work, explaining:

> [M]y pain is—it's too hard for me to be in one position too much. It hurts to sit too long. It hurts to stand too long. It hurts to walk too much. It's just completely different than normal. . . . I never know how I'm going to feel day to day. I was not a reliable employee.

Her primary care physician agreed that Erinn's chronic daily pain prohibited her from working "a standard 40-hour-per-week job or attend[ing] work regularly part-time." He said there was a "[z]ero" likelihood her injury would improve. This reality led to Erinn's decision to apply for social security disability, although she was still in the early stages of the application process at the time of trial.

The district court credited this evidence in finding Erinn is "currently unable to work because of the pain" and, for child support purposes, limited her income to the annual distributions she received from her trust. *See In re Marriage of Berning*, 745 N.W.2d 90, 92 (Iowa Ct. App. 2007) (giving "considerable deference to the district court's credibility determinations"). In 2019, that gross amount was $8787.[4] But the court found that same trust asset, as well as Erinn's remainder interest in her grandfather's trust and other unspecified "significant assets pursuant to the prenuptial agreement," meant she did not need spousal support. We do not agree based on our de novo review of the record, which shows little likelihood that Erinn's disability will allow her to become self-supporting at a standard of living comparable to the one enjoyed during the marriage even with those other assets.

Aside from Erinn's trust and the four-acre farm, there was little evidence presented about any other premarital assets still in Erinn's possession.[5] What we do know is that at the time of trial, Erinn had $142,077 in her trust, which was comprised of mutual funds, securities, and stocks. While the trust agreement allowed Erinn to invade the principal of the trust as its sole beneficiary and trustee, there was no evidence about the tax consequences of doing so. *See* Iowa Code § 598.21A(1)(g); Samuel D. Brunson, *Mutual Funds, Fairness, and the Income Gap*, 65 Ala. L. Rev. 139, 141–42 (2013) (discussing the taxation of mutual funds).

---

[4] With an agreed upon gross annual income of $74,468.16 for Jason, this resulted in Jason owing Erinn $613.25 per month in child support for the parties' now fifteen-year-old child.

[5] The parties did discuss the Arabian horses Erinn had owned with her father, but Erinn testified none of those were in existence any longer. There was no testimony about what horse-related equipment, trophies, inherited jewelry, or art Erinn still had in her possession, although Erinn said she no longer had the $63,000 whole life insurance policy.

Further, as Erinn testified, her trust will not last long if she has to "live off of" it. Once Erinn's trust is depleted, she has no guaranteed source of income. We do not consider Erinn's remainder interest in her grandfather's trust as a source of support because her mother is currently the sole beneficiary of that trust. *See In re Marriage of Rhinehart*, 704 N.W.2d 677, 681 (Iowa 2005) ("[I]t would not be appropriate to treat the *undistributed* income from the trust as a current source of financial support that would alleviate [a former spouse's] need for alimony."). And Erinn's mother is under no obligation to support her.

While Erinn may be eligible for social security disability, Medicaid, and food stamps, as Jason argues in asserting she has no need for spousal support, the record contained little evidence about the likelihood of Erinn securing those benefits or their amount. *See In re Marriage of Sisson*, 843 N.W.2d 866, 874 (Iowa 2014) (declining to "fully consider the potential availability of future social security benefits because the record contained no evidence as to the availability or amount of such benefits"). Although Erinn will not have a house or car payment, she does have other necessary expenses, like food, health insurance, car insurance, water, propane, electric, and internet. By Jason's own estimate, the last five items alone will cost Erinn just shy of $430 per month. Erinn estimates that if she does not qualify for Medicaid, private health insurance will cost her $718.63 per month plus increased out-of-pocket costs.

In contrast to Erinn, whose future monetary prospects are limited, forty-six year old Jason has moved into the peak of his career with many years of earning ahead of him. *See In re Marriage of Schenkelberg*, 824 N.W.2d 481, 486 (Iowa 2012) ("The comparative income of the spouses is another factor for the court to

consider when evaluating an award of spousal support."); *accord* Iowa Code § 598.21A(1)(e); *Gust*, 858 N.W.2d at 411–12. Although he's taking on more marital debt, Jason is not leaving the marriage a pauper. He has a premarital IRA valued at $50,070.89, a Harley Davidson motorcycle, a 2012 Dodge Ram valued at $12,000 against which no debt is owed, and a house with $25,484.97 in equity.

Jason nevertheless argues he cannot afford to pay Erinn spousal support, pointing to a 2021 budget he prepared listing his monthly expenses. Those expenses included the bills he was temporarily paying for Erinn while the divorce was pending. According to this exhibit, Jason argues he only has $32.33 left over at the end of each month from his net income, which he testified does not account for any emergency expenses, savings, clothes, or entertainment. But the exhibit did allocate money for some of those expenses, and others will decrease after the divorce.[6] We accordingly find that Jason does have an ability to pay Erinn spousal support—though in an amount much less than she is requesting.

We acknowledge certain factors weigh against an award of spousal support in this case, like the parties' younger ages, the shared care of their son, and the tax consequences of spousal support payments to Jason. *See In re Marriage of Mann*, 943 N.W.2d 15, 21 (Iowa 2020) (noting recent changes in federal income tax laws will result in spousal support payments not being tax deductible and

---

[6] For instance, at the end of budget week four, Jason set aside $100 for miscellaneous medical expenses plus $110 for miscellaneous house and truck expenses. He also budgeted $400 per month in groceries for himself and his child, who will be there just part-time. And he allocated $200 per month at Wal-Mart, which in his financial affidavit he indicated was for clothes for himself and the parties' child. Finally, once Erinn rolls off his health insurance, that expense will decrease from over $700.00 per month to $455.37.

payments received not taxable). In the end, however, this case falls within those marriages of shorter duration where traditional spousal support is appropriate because of the recipient spouse's disability and lack of earning capacity, which result in an inability to become self-supporting at a standard of living reasonably comparable to the one enjoyed during the marriage. *See, e.g.*, *Ware*, 2018 WL 4360922, at *4 (twenty-five year marriage but with a fourteen-year separation); *In re Marriage of Richards*, No. 14-1698, 2015 WL 4935847, at *3 (Iowa Ct. App. Aug. 19, 2015) (sixteen-year marriage but modifying the award to terminate at the age of retirement); *In re Marriage of Walker*, No. 13-1310, 2014 WL 4937727, at *7–9 (Iowa Ct. App. Oct. 1, 2014) (eleven years); *In re Marriage of Stone*, No. 10-1061, 2011 WL 662645, at *5 (Iowa Ct. App. Feb. 23, 2011) (eleven years). *But see In re Marriage of Gutcher*, No. 17-0593, 2018 WL 5292082, at *5 (Iowa Ct. App. Nov. 7, 2018).

Considering that Jason is already responsible for Erinn's vehicle payments of $460 per month, we find that his spousal support obligation should be set at $400 per month from the entry of the dissolution decree. When Jason's child support obligation ends, his spousal support payments shall increase to $1000 per month. *See Gust*, 858 N.W.2d at 404 (affirming award of spousal support increasing from $1400 to $2000 per month upon termination of child support). These spousal support payments shall terminate upon Erinn's remarriage or the death of either party. We remand for a recalculation of Jason's past and future child support obligation so that spousal support can be taken into account pursuant

to Iowa Court Rule 9.5.  *See Pazhoor*, ___ N.W.2d at ___, 2022 WL 815293, at

*11.  Costs on appeal are assessed to Jason.

**AFFIRMED AS MODIFIED AND REMANDED.**