# IN THE COURT OF APPEALS OF IOWA

No. 22-0758
Filed November 2, 2022

IN RE THE MARRIAGE OF KATIE ANN HIATT
AND JEREMY SCOTT HIATT

Upon the Petition of
**KATIE ANN HIATT,**
      Petitioner-Appellee,

**And Concerning**
**JEREMY SCOTT HIATT,**
      Respondent-Appellant.
_____

Appeal from the Iowa District Court for Story County, Bethany J. Currie,

Judge.


A former spouse appeals the physical care and spousal support provisions

of the parties' dissolution decree. **AFFIRMED.**


Matthew G. Sease of Sease & Wadding, Des Moines, for appellant.

Nicole S. Facio of Newbrough Law Firm, LLP, Ames, for appellee.


Considered by Vaitheswaran, P.J., and Greer and Schumacher, JJ.

**SCHUMACHER, Judge.**

Jeremy Hiatt appeals the physical care and spousal support provisions of the parties' dissolution decree. Katie Hiatt requests appellate attorney fees. We affirm the district court decree placing the children in Katie's physical care and ordering Jeremy to pay $500 per month for sixty months in spousal support. We determine Jeremy should pay Katie's appellate attorney fees.

### I.      Background Facts & Proceedings

Jeremy and Katie were married in 2007. They have two children, born in 2008 and 2012. Katie petitioned for dissolution of marriage on July 1, 2021. The parties separated in January 2022. Katie and the children remained in the marital residence, while Jeremy moved to a nearby townhouse.[1] Trial on the dissolution petition was held in February 2022.

Katie, thirty-nine years old, is a registered nurse employed at a medical clinic, where she earned $50,575 in 2021. She has an associate degree in nursing. Jeremy is forty-one years old. He attended college for approximately three years prior to the marriage but did not earn a degree. He is employed at a car dealership. Throughout most of the marriage he was a new car salesperson and earned about $100,000 annually in commissions. Beginning March 1, he will be the delivery, sales, and product specialist team leader and earn $90,000 annually as a salary, rather than relying on commissions. In his new position, he will have every other weekend off work.

---

[1] Jeremy's townhouse is one mile from the marital residence.

Katie testified to Jeremy's drinking problem. Jeremy agreed that he had an issue with alcohol and had not stopped drinking as of the time of trial. When Jeremy got home from work, he would go out to the parties' heated garage and spend the evening drinking alcohol. While Jeremy had Wednesdays off, rather than stay home with the children, he would go out to bars. Katie testified Jeremy was "aggressive and mean" when drunk. He punched holes in the walls of the family home when he was upset. Katie also stated Jeremy sometimes drove after he consumed alcohol.

Jeremy also testified to his gambling problem. He stated that in 2021 he spent about $20,000 to $21,000 in gambling. Jeremy engaged in online sports gambling and at times also went to a casino. He held poker games in his garage. Jeremy spent large amounts of money on scratch-off tickets. At Jeremy's request, Katie cashed out her IPERS retirement account of about $32,000, and Jeremy also took loans against his 401k account. In 2019, Jeremy had $43,000 of debt. Through a debt collection agency, he paid it down to $9094 at the time of the trial. Jeremy began therapy in May 2021, and although he felt this was helping him with his gambling problem, he had not ceased the consumption of alcohol. He stated he ceased online gambling two months before trial, but he continued to participate in other forms of gambling.

The district court issued a dissolution decree in March. The court placed the children in the parties' joint legal custody and in Katie's physical care. The court found "Katie has been the boys' primary caretaker since birth." Jeremy was granted visitation on every Wednesday, alternating weekends, alternating holidays, and two weeks in the summer. He was ordered to pay child support of

$1080.97 per month for the two children.[2]  Jeremy was ordered to pay spousal support of $500 per month for sixty months.

The court divided the parties' marital property.  The court found Jeremy dissipated marital assets in the amount of $41,050.92.  Katie received the marital residence.  The equity in the home was $88,171.  The court determined Jeremy was entitled to one-half of the equity, $44,085.50, but because he dissipated $41,050.92, Jeremy's share was reduced to $3034.58.  The court determined Katie had $22,800.40 more in her 401(k) than Jeremy had in his 401(k).  The court required Katie to pay Jeremy one-half of that amount through the entry of a qualified domestic relations order.  The parties each kept their individual bank accounts, personal property, and other items in their possessions.  The court ordered Jeremy to pay $2500 for Katie's attorney fees.

Jeremy appeals the physical care and spousal support provisions of the dissolution decree.[3]  Katie requests appellate attorney fees.

## II.    Standard of Review

We review dissolution of marriage decrees in equity.  *In re Marriage of Knickerbocker*, 601 N.W.2d 48, 50 (Iowa 1999).  In equitable actions, our review is de novo.  Iowa R. App. P. 6.907.  "In such cases, '[w]e examine the entire record and adjudicate anew rights on the issues properly presented.'"  *Knickerbocker*, 601

---

[2] When Jeremy's spousal support obligation ends, his child support obligation will increase to $1185.52 per month.

[3] Although Jeremy's brief indicated he was appealing the award to Katie of $2500.00 in trial attorney fees, his arguments are limited to custody and spousal support.  The failure in a brief to state, to argue or to cite authority in support of an issue may be deemed a waiver of that issue.  Iowa R. App. P. 6.14(1)(c).  We conclude Jeremy has waived this issue.  *See Hickman v. State*, 796 N.W.2d 458 (Iowa Ct. App. 2004).

N.W.2d at 50–51 (alteration in original) (citation omitted). "In equity cases, especially when considering the credibility of witnesses, the court gives weight to the fact findings of the district court, but is not bound by them." Iowa R. App. P. 6.904(3)(g).

### III. Physical Care

Jeremy contends the district court should have placed the children in the parties' joint physical care. He states that both parents were active in caring for the children and argues that the parties agreed to a joint physical care arrangement in the month before the trial after he left the family home.[4]

The court considers the factors in Iowa Code section 598.41(3) (2021) and *In re Marriage of Winter*, 223 N.W.2d 165, 166-67 (Iowa 1974), in determining a physical care placement in the best interests of children. Courts look for a placement that will best promote the long-term physical and emotional health of the children. *In re Marriage of Hansen*, 733 N.W.2d 683, 700 (Iowa 2007). Each decision is based on the unique facts of the case. *Id.* "In child custody cases, the first and governing consideration of the courts is the best interests of the child." Iowa R. App. P. 6.904(3)(o); *In re Marriage of Roberts*, 954 N.W.2d 757, 760 (Iowa Ct. App. 2020).

In determining whether joint physical care is appropriate, the court considers these factors:

> (1) "approximation"—what has been the historical care giving arrangement for the child between the two parties; (2) the ability of the spouses to communicate and show mutual respect; (3) the

---

[4] Katie testified she "let Jeremy have his way" for a one-month period prior to trial concerning the parenting schedule but did not believe such was best for the children as a final schedule. A temporary order was not entered in this matter.

degree of conflict between the parents; and (4) "the degree to which the parents are in general agreement about their approach to daily matters."

*In re Marriage of Berning*, 745 N.W.2d 90, 92 (Iowa Ct. App. 2007) (quoting *Hansen*, 733 N.W.2d at 697–99).

In regard to the element of approximation, Katie testified that during the marriage, "On a daily basis [Jeremy] would come home from work and come inside and change clothes, say hi to everybody and go out to the garage and drink for the evening." Jeremy agreed with this testimony. When Jeremy had a day off from work, he would go to bars rather than spend time with the children. The evidence shows Katie was the primary caretaker for the children during the marriage. She was the parent who took them to medical appointments, assisted with homework, and supported their extracurricular activities.

On the second element, we find Jeremy did not show mutual respect to Katie during the marriage. He called her names in front of the children. In order to control the parties' finances so he could hide his gambling debts, Jeremy disparaged Katie's financial acumen and would not let her have access to the parties' financial information.

On the third element, conflict between the parties, Katie stated that usually matters were Jeremy's way or the highway. She testified Jeremy could be "aggressive and mean" when he had been drinking. Katie went to great lengths to appease Jeremy so that the children would not be exposed to his temper. She stated:

> I know what triggers him and what upsets him and when I'm around the kids, I just try to not do that and try to keep things as happy as

can be and if he is intoxicated, just to act normally and act like it's going to be fine, it's fine.

Finally, as to the fourth element, we find the parties had different approaches to parenting the children. Katie was involved in the children's lives to a great extent. On the other hand, Jeremy spent much of his time pursuing his individual interests. At times, Jeremy was critical about the children's achievements. In addition, he and Katie disagreed on their approach to the youngest child, who Jeremy felt was too "sensitive."

After consideration of the required elements on our de novo review and our close review of this record, we determine joint physical care would not be in the children's best interests and none of the four factors outlined in *Hansen* support joint physical care in this case. *See* 733 N.W.2d at 697–99. We conclude that the district court properly placed the children in Katie's physical care.

## IV. Spousal Support

Jeremy disputes the district court's award of spousal support to Katie. The court awarded Katie spousal support of $500 per month, to expire at the earliest of (1) sixty months, (2) the death of either party, or (3) Katie's remarriage. Jeremy highlights that Katie will not be moving or changing jobs, and he states she has no need for spousal support. He states Katie will be making about the same income, about $50,000 per year, while his income will be reduced to $90,000 per year in his new position.

"Our cases repeatedly state that whether to award spousal support lies in the discretion of the court, that we must decide each case based upon its own particular circumstances, and that precedent may be of little value in deciding each

case." *In re Marriage of Gust*, 858 N.W.2d 402, 408 (Iowa 2015). The court considers the statutory factors in section 598.21A(1)[5] and makes an equitable award of spousal support. *See In re Marriage of Pazhoor*, 971 N.W.2d 530, 538 (Iowa 2022). We will disturb the district court's award of spousal support "only when there has been a failure to do equity." *Gust*, 858 N.W.2d at 406 (citation omitted).

An award of spousal support may come within the categories of rehabilitative, reimbursement, traditional, or transitional, or a hybrid of these types. *Pazhoor*, 971 N.W.2d at 539–40. Transitional spousal support was recently recognized by the Iowa Supreme Court,

> Transitional alimony can ameliorate inequity unaddressed by the other recognized categories of support. Divorcing spouses must

---

[5] The factors found in section 598.21A(1) are as follows:
  a. The length of the marriage.
  b. The age and physical and emotional health of the parties.
  c. The distribution of property made pursuant to section 598.21.
  d. The educational level of each party at the time of marriage and at the time the action is commenced.
  e. The earning capacity of the party seeking maintenance, including educational background, training, employment skills, work experience, length of absence from the job market, responsibilities for children under either an award of custody or physical care, and the time and expense necessary to acquire sufficient education or training to enable the party to find appropriate employment.
  f. The feasibility of the party seeking maintenance becoming self-supporting at a standard of living reasonably comparable to that enjoyed during the marriage, and the length of time necessary to achieve this goal.
  g. The tax consequences to each party.
  h. Any mutual agreement made by the parties concerning financial or service contributions by one party with the expectation of future reciprocation or compensation by the other party.
  i. The provisions of an antenuptial agreement.
  j. Other factors the court may determine to be relevant in an individual case.

adjust to single life.  If one is better equipped for that adjustment and the other will face hardship, then transitional alimony can be awarded to address that inequity and bridge the gap.  We now formally recognize transitional alimony as another tool to do equity.

*Id.* at 542.

In awarding Katie spousal support, the district court found:

Jeremy earns quite a bit more income than Katie does ($90,000 versus $56,721.60).  He can afford to contribute to Katie's standard of living without destroying his standard of living in the process.  Furthermore, Katie left a higher paying job at [a hospital] to have better hours for the family.  As Katie is the primary care parent, she is unable to return to [the hospital] or another hospital that could pay more but would also require a lot of overnight and weekend hours.  Katie is leaving the marriage with relatively few assets with which she can support herself.

We find the court properly awarded Katie spousal support for a limited period of time to help her adjust to single life.  *See id.*  The court's reasoning and award of spousal support does not show a failure to do equity under the circumstances of this case.  *See Gust*, 858 N.W.2d at 406.  We affirm the court's spousal support decision.

## V. Appellate Attorney Fees

Katie requests attorney fees for this appeal.  Counsel submitted an attorney fee affidavit reflecting $4425 in appellate attorney fees and expenses of $123 for a total of $4548.  Jeremy disputes Katie's need for appellate attorney fees.  He also notes the reduction in his salary due to his recent change in position at the car dealership.

Appellate attorney fees are awarded upon our discretion and are not a matter of right.  *See In re Marriage of Okland*, 699 N.W.2d 260, 270 (Iowa 2005).  When considering whether to exercise our discretion, we consider "the needs of

the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal." *Id.* (citation omitted).

Even after Jeremy's change in position, he will be earning more than Katie. Jeremy will still be earning $90,000 per year, while Katie earns about $50,000 per year. Katie was awarded the marital residence but very little in cash assets. We find Jeremy is in a better financial position to pay appellate attorney fees. And Jeremy did not succeed in the issues he raised on appeal. We determine Jeremy should be responsible for Katie's requested appellate attorney fees.

We affirm the decision of the district court and award Katie appellate attorney fees of $4548. Costs of the appeal, if any, are assessed against Jeremy.

**AFFIRMED.**