**IN THE COURT OF APPEALS OF IOWA**

No. 24-0100
Filed December 4, 2024

**IN RE THE MARRIAGE OF JEFFERY ALAN MAU**
**AND ANN MARIE MAU**

**Upon the Petition of**
**JEFFERY ALAN MAU,**
        Petitioner-Appellant,

**And Concerning**
**ANN MARIE MAU,**
        Respondent-Appellee.
_____

        Appeal from the Iowa District Court for Scott County, Patrick A. McElyea,

Judge.


        A former spouse appeals the denial of his petition to modify legal custody

and physical care concerning a minor child and other claims following a stipulated

dissolution of marriage. **AFFIRMED.**


        Paul L. Macek of Hopkins & Huebner, P.C., Davenport, for appellant.

        Ryan M. Beckenbaugh of Beckenbaugh Law, P.C., Davenport, for appellee.


        Considered by Ahlers, P.J., and Chicchelly and Buller, JJ.

**BULLER, Judge.**

Jeffery (Jeff) Mau appeals a district court ruling addressing his and ex-wife Ann Marie Mau's dueling petitions for modification. On appeal, Jeff raises four issues—concerning legal custody and physical care of a minor child, the admissibility of certain evidence (including pre-decree conduct), division of assets after sale of the home, and division of Jeff's retirement accounts. Ann Marie resists each of Jeff's arguments and requests appellate attorney fees. On our review, we affirm and order Jeff to pay Ann Marie $15,647.50 in fees.

## I.        Background Facts and Proceedings

Jeff and Ann Marie divorced by stipulation in February 2020. They agreed to joint legal custody and Anne Marie having physical care of their then-six-year-old child. The stipulation also provided Jeff parenting time every other weekend and every other Wednesday during the school year.

Things rapidly deteriorated between the parties after the divorce. They fought over essentially everything—prescriptions and appointments for the child's somewhat complicated medical needs, drop-offs and pick-ups, parent-teacher conferences, summer visitation, and everything in-between. In court, Jeff applied for a rule to show cause relating to sale of the marital home and a dispute over costs, the lawyering grew contentious, and the court found Ann Marie in contempt. Ann Marie then filed a motion for court involvement relating to the qualified domestic relations order (QDRO) that was the subject of a previous appeal and petitioned to modify the decree such that she had sole legal custody of the minor child. Jeff counterclaimed seeking sole legal custody and physical care for himself. As the district court put it, "[b]oth parents [took] an all-or-nothing approach."

Discovery disputes followed, and the court denied a motion to compel filed by Jeff, finding Ann Marie had complied with her obligations and ordering Jeff to pay $500 of Ann Marie's attorney fees. The court next quashed a subpoena filed by Jeff, granted a protective order limiting depositions, and ordered Jeff to pay another $600 in Ann Marie's attorney fees. Then the court granted another protective order limiting depositions to stop Jeff from deposing witnesses about irrelevant and pre-decree conduct.

Ann Marie sought to exclude evidence of pre-decree conduct from trial, including but not limited to the conduct that was the subject of the earlier protective order. She also sought a third protective order regarding certain surreptitious video recordings she alleged were obtained in violation of Illinois law. In oral rulings, the court informed the parties it would generally not admit any pre-decree evidence because the court had no interest in re-litigating the stipulated decree.

It would serve little purpose for us to recount the full blow-by-blow of the parties' trial testimony, in which each essentially sought to paint the other as a villain in nearly every interaction between them since the divorce. One particularly troublesome incident warrants some focus. In 2021, the child was referred to pediatrician Dr. Barbara Harre for an evaluation due to mental-health and behavioral issues. The child continued to see Dr. Harre without incident until a May 2022 follow-up appointment. During this appointment, in Dr. Harre's words Jeff "launched into an angry—I would say hostile—tirade about how no one was keeping him informed," even though he was welcome at every appointment. During this "tirade," the child "curled up and snuggled into" Ann Marie. Jeff grew so loud that Dr. Harre's staff came back to check on her and the child. Jeff

threatened to sue Dr. Harre, claiming she was violating the divorce decree by not sharing the child's medical information with his mother (the child's grandmother). Dr. Harre testified that the whole exchange—some forty minutes driven by Jeff's "hostile" outbursts—was unhealthy "bullying" that was likely contributing to the child's mental-health problems. And she expressed skepticism that Jeff could look out for the child's best interests, particularly when it came to the child's medical needs. In his testimony, Jeff did not dispute that Dr. Harre warned him that she was considering discontinuing care for the child because of Jeff's behavior, but he otherwise disagreed with Dr. Harre and Ann Marie's descriptions of the event or claimed he couldn't recall the specifics.

Beyond the particulars of the parties' disagreements, we think the district court summarized the relationship between them well: "contentious would be a gross understatement. There is virtually no trust between Jeff[ ] and Ann Marie, which, essentially, negates their ability to effectively coparent." As just one example of this, the court highlighted that, even when the parties were seeking emergency medical care for the child, they were unable to effectively communicate, choosing to email each other rather than pick up the phone. And the court was particularly struck by how, when Jeff learned the child was headed to the emergency room, Jeff immediately called his divorce attorney to protect his interest in litigation—rather than focusing on the child's welfare. After the child was released from the hospital, both parties argued for more than an hour over where to drop the child off, and Ann Marie later called the police to conduct a welfare-check. From this, the court concluded that "both parties have placed their animosity towards one another and their desire 'to win' above the needs of their

child." And the court concluded both parents have put the child "in the middle" and remained unable to effectively communicate.

In its modification ruling, the district court observed that "[a]ll of these facts make this a very difficult decision for the court," and it ultimately declined to grant Jeff's petition to modify. The court emphasized that Jeff was capable of being a good father but had not met his heavy burden to show he was a superior caregiver compared to Ann Marie. The court expressly found that Jeff "does not demonstrate the same commitment to his son that Ann Marie does" and noted that his "request for primary physical care and sole legal custody appears to be motivated by a desire to win rather than a genuine desire to be the primary caretaker."

As for Ann Marie's request for sole legal custody, the court found evidence on both sides of the question but ultimately determined sole legal custody was warranted based on the parties' inability to communicate appropriately; their tendency to manipulate or attempt to manipulate each other, the court, and their child; their inability to support each other as parents; and their win-at-all costs mentalities. In so ruling, the court repeatedly emphasized its familiarity and first-hand observations of the dynamics between the parties, observing: "It is evident to this Court, having presided over much of their post-decree litigation, that this is not about fairness and equity, it is about winning and righting whatever perceived wrongs happened during their relationship." The court ultimately found that the child needed to have a primary caregiving decisionmaker and, between the two options, "Ann Marie has demonstrated the ability to better administer to his medical, emotional, and educational needs." In the end, the court modified the

decree to place sole legal custody with Ann Marie and preserved the stipulated physical-care and visitation arrangement.

The court also resolved a factual and financial dispute between the parties over who would be responsible for certain costs associated with selling the marital home. In ruling on this issue, the court found credible testimony that Ann Marie caused certain water damage, and the court found Jeff's claim about other costs and billing for yardwork incredible and unsupported by the law. The court found the plumbing costs were divisible and payable by Ann Marie—and everything else claimed by Jeff was not. And it ordered release of Ann Marie's portion of the proceeds, minus her share of these expenses.

Last, the court addressed a lingering dispute concerning a QDRO related to Jeff's retirement accounts. The parties submitted evidence regarding the date the accounts were opened, and the court ultimately ordered that Ann Marie receive 62.53% of the retirement assets after an agreed-upon distribution and Jeff 37.47%. In entering this order, the court addressed a prior decision of our court, which we will discuss in more detail later in this opinion.

Jeff appeals, challenging denial of his petition for modification of custody and the court's decision to grant Ann Marie sole legal custody, the court's ruling on the admissibility of evidence, the determination of costs associated with selling the marital home, and the court's handling of the QDRO.

## II.     Standards of Review

Our review in dissolution modification cases is de novo. *In re Marriage of Hoffman*, 867 N.W.2d 26, 32 (Iowa 2015). We give weight to the district court's factual findings, particularly regarding the credibility of witnesses, but we are not

bound by them. *Id.* On custody questions, "[t]he child[ ]'s best interest is the 'controlling consideration.'" *Id.* (citation omitted). On issues related to marital property, "we will disturb the trial court's order only when there has been a failure to do equity." *In re Marriage of Gust*, 858 N.W.2d 402, 406 (Iowa 2015) (cleaned up). Within this same rubric, we also review issues related to QDROs de novo. *See In re Marriage of Veit*, 797 N.W.2d 562, 564 (Iowa 2011).

We review the district court's ruling on the admissibility of evidence for an abuse of discretion. *In re Marriage of Thielges*, 623 N.W.2d 232, 239 (Iowa Ct. App. 2000).

## III. Discussion

The issues on appeal concern Jeff's claims about legal custody and physical care, various evidentiary issues, costs related to sale of the home, and a QDRO. Ann Marie defends the district court's order and requests appellate attorney fees. We analyze each of these claims separately.

### A. Legal Custody and Physical Care

We consider the custody and care of the parties' minor child first, as this issue consumed the majority of the district court record. We begin by recognizing our review is not the same as it might be if we were reviewing a contested decree and an initial assessment of custody and care. Instead, our review is more limited at this later stage:

> A party seeking modification of a dissolution decree must prove by a preponderance of the evidence a substantial change in circumstances occurred after the decree was entered. The party seeking modification of a decree's custody provisions must also prove a superior ability to minister to the needs of the children.

*In re Marriage of Harris*, 877 N.W.2d 434, 440 (Iowa 2016) (citation omitted). Under our case law, the changed circumstances "must be more or less permanent" and "relate to the welfare of the children." *Hoffman*, 867 N.W.2d at 32 (citation omitted).

The district court's finding that a material and substantial change took place is uncontested by these parties. So we move to the next step of the analysis, which requires that, to warrant modification, the parent seeking to modify the status quo bears a "heavy burden" justified by only "the most cogent reasons" which demonstrate a superior ability to care for the child. *In re Marriage of Frederici*, 338 N.W.2d 156, 158 (Iowa 1983); *see also Hoffman*, 867 N.W.2d at 32.

"The criteria for determining child custody are applied in modification proceedings," including the factors found in Iowa Code section 598.41 (2022) and other modification cases. *In re Marriage of Courtade*, 560 N.W.2d 36, 37 (Iowa Ct. App. 1996). As the district court observed, and the supreme court recently held, legal custody is all-or-nothing—there is no parsing out of certain legal rights from others. *In re Marriage of Frazier*, 1 N.W.3d 775, 786 (Iowa 2024). Perhaps the most compelling justification supporting sole legal custody for Ann Marie is that the parties are no longer able to coparent in any meaningful sense. *See In re Marriage of Rolek*, 555 N.W.2d 675, 677 (Iowa 1996) ("When, following a dissolution decree providing joint custody, the actions of the parties indicate that they are no longer able to cooperate, a modification of the custody status is appropriate.").

Many of the district court's findings on this basis are wrapped up in credibility determinations that we are loathe to disturb, but we also find the record independently and abundantly establishes the still-growing discord and inability of

these parties to coparent. We agree with the district court that it was appropriate to select a sole legal decision maker. And between the two parties, Ann Marie was better able to minister to the child's needs, as her involvement in the child's medical and schooling issues was significantly greater than Jeff's. We also find it striking in our review of these two imperfect parents that Ann Marie repeatedly expressed regret for times she behaved inappropriately or could have made better choices; Jeff, in contrast, had no apologies to offer for his behavior toward Ann Marie or anyone else (including Dr. Harre) and no recognition of how his behavior affected the child. We affirm, as it was "unreasonable" to continue joint legal custody and sole legal custody with Ann Marie was in the child's best interests. *See* Iowa Code § 598.41(2)(b).

As for the physical-care determination, our foremost consideration is again the best interests of the child. Iowa R. App. P. 6.904(3)(n); *In re Marriage of Hansen*, 733 N.W.2d 683, 700 (Iowa 2007). Given our decision on legal custody, it follows that physical care of the child remains with Ann Marie. *See, e.g.*, *In re Marriage of Anderson*, No. 23-1224, 2024 WL 4615622, at *6 (Iowa Ct. App. Oct. 30, 2024) ("[A] parent without legal custody of a child cannot be awarded physical care."); *cf.* Iowa Code § 598.41(5) (limiting joint physical care to cases with joint legal custody).

We affirm the district court's ruling granting sole legal custody and maintaining physical care with Ann Marie.

### B. Evidentiary Issues

Jeff next challenges the admission of several exhibits, a deposition transcript, and evidence about the number of persons he had dated since the

divorce. Other than the deposition transcript and question about his dating life, we understand Jeff's argument and the district court's ruling to revolve around pre-decree conduct, and the district court excluding them on that basis. On our review, we cannot say the district court abused its broad discretion in so ruling. *See Thielges*, 623 N.W.2d at 239. Assuming without deciding the evidence was otherwise admissible under the rules of evidence (which Ann Marie does not concede), we look to our case law regarding when pre-decree conduct is relevant in a modification hearing: "A parent seeking modification must prove by a preponderance of the evidence that the circumstances have so materially and substantially changed *since the decree was entered* that the requested modification is in the children's best interests." *Frazier*, 1 N.W.3d at 781 (emphasis added). In other words, pre-decree conduct is generally not relevant and not admissible. *See id.*; *In re Marriage of Maher*, 596 N.W.2d 561, 565 (Iowa 1999) (noting any changed circumstances "must not have been within the contemplation of the district court" at the time of the decree). *But see In re Ziegler*, No. 05-0911, 2006 WL 623685, at *3 (Iowa Ct. App. Mar. 15, 2006) (affirming admission of father's pre-decree domestic abuse as evidence he was not a suitable caretaker for the child).

We see no reason why the evidence proffered by Jeff here would justify deviation from the normal rule. And we broadly share the district court's concern that opening the floodgates to pre-decree evidence is undesirable from the perspective of courtroom management and efficient use of judicial resources. In the same vein, we believe statements made by Ann Marie's counsel below that, had the door been opened to pre-decree evidence, she had video and

documentary evidence prepared to rebut it, which would have furthered the devolution into a collateral mini-trial.  This is exactly the kind of distraction from the main issue that the rules of evidence guard against, and we discern no abuse of discretion in the court preventing Jeff from relitigating the divorce.

The next portion of Jeff's evidentiary claim concerns a transcript of the deposition of a man Ann Marie dated, with the initials J.C.P.  We do not address the admissibility of this exhibit on the merits because we conclude the issue was not preserved for our review by offer of proof or other adequate means.  Jeff's trial counsel made some assertions that this witness was unavailable and out of state; Ann Marie's counsel disagreed, indicating the witness was available and had never been contacted by Jeff's attorney via subpoena or otherwise.  Neither party offered evidence on this point, and the deposition was not admitted into evidence as an offer of proof.[1]  Because the issue was not preserved, we do not analyze it further. *See* 7 Laurie Kratky Doré, *Iowa Practice Series: Evidence* § 5.103:11 (Oct. 2023) (collecting cases on the necessity of a specific offer of proof to preserve error, including a record regarding the relevance of the proffered exhibit); *State v. Lange*, 531 N.W.2d 108, 114 (Iowa 1995) ("This court considers offers of proof so important that we require them to preserve error."); *cf. Papiboune v. Deibarra*, No. 22-1628, 2024 WL 960965, at *1 (Iowa Ct. App. Mar. 6, 2024) (finding error not preserved where there was "nothing before us memorializing any formal or

---

[1] We recognize the district court did not allow Jeff to make an offer of proof on the pre-decree evidence, but the district court made no such prohibition regarding the deposition of J.C.P.  And even if the district court had directed Jeff not to make an offer of proof, that would not resolve the lack of record on whether the witness was in fact unavailable or out of state.

informal offers of proof—or even a rough summary of the testimony at issue"). But we also observe that, from what we can deduce of the context for the deposition and J.C.P.'s relationship with Ann Marie, we seriously doubt the deposition would have affected the outcome.

Jeff also complains that the district court excluded evidence regarding the number of sexual or romantic partners he had since the child was born. Although not a model of clarity, Jeff apparently wished to offer this to contrast his own dating life (presumably sparse) with Ann Marie's (which he denigrated as excessive or inappropriate). But Jeff's appellate brief misunderstands or misconstrues the district court: the court did not exclude all evidence on this issue but instead instructed Jeff's counsel that he could "ask the question as of" the date of the decree. That Jeff's counsel declined to follow the district court's direction is no basis for relief. And the merits of this ruling do not reflect an abuse of discretion for the reasons we have already discussed.

Last, we recognize some legal tension alluded to in Jeff's brief, where he claims that, because our review is de novo and the case sounds in equity, the district court should not have been able to exclude the pre-decree evidence and constrain his presentation of evidence below. *See In re Marriage of Erickson*, 228 N.W.2d 57, 59 (Iowa 1975) ("[U]nder our rules in equity cases evidence is ordinarily allowed to come in subject to objection without rulings by the court so that the entire record is before the reviewing court for de novo appeal."). While often evidence is received subject to objection in equity, this does not mean every equity trial must be an evidentiary free-for-all. The district judge remains master of the courtroom and is afforded considerable latitude in "matters relating to the

course and conduct of a trial." *In re Marriage of Ihle*, 577 N.W.2d 64, 67 (Iowa Ct. App. 1998). And Jeff has not shown any abuse of that considerable latitude and discretion.

### C. Costs Related to Home Sale

At trial, the parties and their realtor testified as to expenses incurred regarding the marital home before it was sold. Jeff calculated his expenses at just under $10,000, and he requested that Ann Marie pay half that—which would exceed the roughly $4000 she received in proceeds from sale of the home. We decline to repeat at length the various itemized charges the parties bickered over below. As pertinent to the issues raised on appeal, we agree with the district court that it was appropriate for Ann Marie to pay the costs associated with water damage she caused. And we both credit and agree with the district court's credibility findings rejecting Jeff's claims he should be reimbursed for yard work and decluttering the home, which we find border on frivolous. Consistent with the deference we show to district court valuations of marital property, we find the district court's determination of costs related to sale of the home "within the range of permissible evidence," and we affirm because we see no failure to do equity. *Cf. In re Marriage of McDermott*, 827 N.W.2d 671, 679 (Iowa 2013).

We understand that at least part of Jeff's argument on appeal contends the district court should have blindly accepted the realtor's summary of expenses. The parties negotiated that the realtor would settle disagreements, but only as to "repair[s]" of the home. To the extent the fight on appeal concerns review of this language and not principles of equity, our review would be for correction of errors at law. *See* Iowa R. App. P. 6.907. But we are confident we would come to the

same conclusion under either standard of review, as we agree with the district court that the yardwork, decluttering, and other miscellaneous attempts by Jeff to bill were not "repair[s]" within the meaning of the stipulated decree. *See Repair*, *Black's Law Dictionary* (12th ed. 2024) ("The process of restoring something that has been subjected to decay, waste, injury, or partial destruction, dilapidation, etc.; an instance or a result of this process.").

Last, to the extent Jeff now claims he should also be entitled to some calculation of expenses (seemingly based on the carrying costs of the mortgage) due to "delay" attributable to Ann Marie, error was not preserved.

> It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal. . . . When a district court fails to rule on an issue properly raised by a party, the party who raised the issue must file a motion requesting a ruling in order to preserve error for appeal.

*Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002) (internal citations omitted). We are skeptical this claim was adequately raised below, and it certainly was not decided by the district court. We do not address it further. *See id.*

### D. QDRO Calculations

Jeff also appeals how the district court handled a tricky issue concerning the QDRO. The procedural posture is unusual. In an earlier appeal, Jeff sought to enforce the language of the stipulated decree and a proposed order to essentially undo the district court's equitable modification of his proposed QDRO. *See In re Marriage of Mau*, No. 20-1422, 2021 WL 1663608, at *2–3 (Iowa Ct. App. Apr. 28, 2021). We reversed and remanded with directions to approve Jeff's proposed QDRO, which purported to rely on the *Benson* formula. *Id.* at *1 n.1, *3

(citing *In re Marriage of Benson*, 545 N.W.2d 252, 257 (Iowa 1996)).[2] On remand to the district court, it became apparent that both Jeff's proposed QDRO and our opinion were not based on a true and accurate accounting of Jeff's retirement accounts or their ages. As a result, the specific QDRO that we ordered be approved did *not* implement the *Benson* formula; the inputs were wrong, so the outputs were too.

Under *Benson*, the numerator is the [number of years of marriage while also participating in the pension plan] while Jeff's proposed QDRO has the numerator as solely [the number of years of marriage]. *See* 545 N.W.2d at 255. The denominator is the number of years the account existed in total. *Id.* Jeff's proposed QDRO used a single age—the oldest account—in its calculations, even though the funds at issue consist of multiple accounts with differing ages. Long story short, Jeff's proposed QDRO does not employ the *Benson* formula, despite what he claimed to us in the first appeal. This renders our remand order to approve the proposed QDRO in conflict with the legal foundations of our opinion.

The district court correctly recognized that we did not intend this result and chose to "follow the spirit" of our earlier decision, which was, after deducting offsets negotiated by the parties, to divide the accounts subject to *Benson* per the parties' agreement. The court did so and, in converting the dollar amounts into

---

[2] It's a little strange that the parties agreed to use the *Benson* formula for these defined-contribution retirement accounts. "[O]ur courts generally have not applied the *Benson* formula to defined-contribution plans (like a [thrift savings plan]), typically reserving the formula only for defined-benefit plans (like [federal and state government] pensions)." *In re Marriage of Bolger*, No. 22-1201, 2023 WL 7378490, at *5 (Iowa Ct. App. Nov. 8, 2023) (citing *Benson*, 545 N.W.2d at 256 n.1 ("[I]t may be more appropriate to divide and distribute defined contribution plans under the present-value method.")).

percentages at the request of the custodian, ruled that, including the offsets, Ann Marie would receive 62.53% of the total retirement assets and Jeff 37.47%. Jeff asserts on appeal that the Ameriprise fund should be divided such that he receives 58% and Ann Marie 42%—based on a third set of calculations. But his proposed distribution does not rectify the factual errors and omissions we have mentioned and the district court addressed in its ruling.

Jeff largely debates the evidence regarding what he calls the "start date" for determining the age of the accounts. Assuming without deciding that Jeff is right there is a conflict in the evidence, the district court resolved the conflict, and we have little reason to second-guess its resolution of the facts on our review of the cold record. This is particularly so because Jeff's appellate claim seems to rely at least in part on Jeff's live testimony, which the district court heard firsthand and discounted in other areas. And contrary to Jeff's assertions on appeal, the district court's implementation this time around conformed with the stipulated agreement rather than imposing its own judgment of the equities. We discern no error in the district court's enforcement of the stipulation or its application of *Benson*.

In resolving this claim, we have considered Ann Marie's alternative argument that, if we give Jeff what he wants by strictly applying the math and incorrect formula he originally proposed in the QDRO, she would receive 92% of the retirements accounts. We choose not to wade into this argument as it was made in the alternative, and we believe the district court's resolution of the issue enforces both the original bargain and the spirit of our decision in the previous appeal. But we recognize that, had the district court not resolved the issue as it did (with the benefit of Ann Marie's somewhat-favorable-to-Jeff calculations), this

would likely be the alternative facing this court—unpalatable though it may be. As we recognized in the earlier appeal, it is not our place to inject our own sense of equity into parties' bargained-for agreements, and Jeff may well be reaping the benefit of the district court's generosity by us affirming the ruling below rather than accepting Ann Marie's alternative disposition.

### E. Appellate Attorney Fees

Ann Marie seeks appellate attorney fees. "An award of attorney fees on appeal is not a matter of right, but rests within the court's discretion and the parties' financial position." *In re Marriage of Gonzalez*, 561 N.W.2d 94, 99 (Iowa Ct. App. 1997). In making this determination, we consider the needs of the requesting party for an award of fees, the ability of the other party to pay, and whether the requesting party had to defend the trial court's decision on appeal. *McDermott*, 827 N.W.2d at 687.

Ann Marie's total request for attorney fees is $15,647.50. She prevailed in all aspects of this appeal, she was required to defend the district court's ruling, and she has significant need for the award given her comparatively limited income and the drain this litigation has had on her finances. *See id.* We appreciate that Ann Marie's counsel timely filed a fee affidavit, though we wish it had been better itemized to enable us to review her request in more detail. That said, Jeff addresses Ann Marie's fee claim with a single sentence in his reply brief: "Ann Marie should not prevail and as such no attorney fees should be awarded." Because Ann Marie prevailed, and because Jeff has not contested the reasonableness of her requested fees (only whether she is entitled to them), we order Jeff to pay Ann Marie's appellate attorney fees in the amount of $15,647.50.

**IV.     Disposition**

We affirm the district court ruling and order Jeff to pay Ann Marie's appellate attorney fees in the amount of $15,647.50.

**AFFIRMED.**