# IN THE COURT OF APPEALS OF IOWA

———————————

No. 25-1025
Filed May 27, 2026

———————————

**In re the Marriage of Katherin Sorensen and Eric Sorensen**

Upon the Petition of
**Katherin Alanna Sorensen,**
Petitioner–Appellee/Cross-Appellant,

And Concerning
**Eric Sorensen,**
Respondent–Appellant/Cross-Appellee.

———————————

Appeal from the Iowa District Court for Montgomery County,
The Honorable Jennifer Benson Bahr, Judge.

———————————

**AFFIRMED ON APPEAL AND CROSS-APPEAL**

———————————

Krisanne C. Weimer of Weimer Law, P.C., Council Bluffs,
attorney for appellant.

Kyle E. Focht of Focht Law Office, Council Bluffs, attorney for appellee.

———————————

Considered without oral argument
by Tabor, C.J., and Badding and Sandy, JJ.
Opinion by Badding, J.

1

**BADDING, Judge.**

Eric Sorensen appeals, and Katherin Sorensen cross-appeals, from the dissolution of their twenty-four-year marriage. Both focus on the district court's award of traditional spousal support to Katherin—a stay-at-home mother of four children. Eric challenges the length of the award, while Katherin challenges the amount. Based on our de novo review of the record, we conclude the court's spousal support award was equitable. *See In re Marriage of Owen*, 29 N.W.3d 6, 10 (Iowa 2025). We accordingly affirm on Eric's appeal and Katherin's cross-appeal.

## I.     Background Facts and Proceedings

The Sorensens married in January 2001 when Katherin was nineteen years old and Eric was twenty. During the early years of their marriage, while they were trying to have children, Katherin pursued a college education and worked part-time. She eventually earned a bachelor's degree in communications in 2009 and obtained full-time employment at a church. Katherin stayed at that job for about a year and a half, quitting when their first child was born in 2011. Because they had been hoping for children so long, the couple decided they "wanted a parent to be able to be with them full-time."

For the next twelve years—during which they welcomed three more children—Katherin was responsible for their care. She homeschooled the children and oversaw their daily routines, transportation, medical and dental appointments, and extracurricular activities. Between these duties, she earned a small income from part-time doula work. But she stopped providing those services about five or six years before the parties' divorce because it was too difficult coordinating childcare while she attended births.

With Katherin's focus on the children, Eric concentrated on providing income for the family. He started working in the construction industry after graduating from high school. Since then, he has advanced his career at several companies—most recently at JE Dunn Construction, where he has worked since 2018. During his time with that company, Eric worked his way up from a mechanical superintendent to his current position as general superintendent. His salary increased with each promotion, going from $129,149 in 2020 to more than $200,000 by 2024. Eric's annual bonuses also increased from $8,300 in 2020 to $21,000 in 2024. He typically worked more than fifty hours per week during the marriage, often fielding calls in the evenings and on weekends.

Sadly, the parties' marriage deteriorated in 2023 when they were both in their early forties. Katherin testified that she started looking for jobs because she "knew that things were not going well" between her and Eric. After submitting around 150 applications, she was hired in September 2023 as a prevention specialist at a behavioral-health organization. She earns $19 per hour and has a flexible schedule that accommodates the children, who are now attending public school. She also earns some income as a piano accompanist at the children's school and through a life-coaching practice that she started in 2023. Between these three jobs, Eric calculated that Katherin was on track to earn $48,246.70 in 2024.

Katherin petitioned to dissolve the parties' marriage in January 2024. Before the dissolution trial that December, the parties agreed their four children should be placed in their joint legal custody and Katherin's physical care, with visitation for Eric. They also agreed that Katherin should remain in the marital home with the children to avoid further disruption for them.

But they disagreed on the division of their other property and debts, as well as child support and spousal support.

The district court resolved those disputed issues in its March 2025 decree, dividing the parties' property and debts nearly equally. As the parties agreed, Katherin received the house, valued at $327,550, along with its debt of $274,129—although Eric was ordered to pay a loan of $16,883 for roof repairs. The court also ordered Eric to pay Katherin $2,949.01 per month in child support, plus $3,000 per month in traditional spousal support. And the court awarded Katherin $5,000 in trial attorney fees.

In a post-trial motion under Iowa Rule of Civil Procedure 1.904(2), Eric asked the district court to reconsider its spousal support award, arguing that it should be reduced in both amount and duration, if not eliminated. The court partially granted the motion, finding "it appropriate to amend Eric's monthly spousal support obligation to $2,000." The court reasoned that its prior award failed to fully account for Eric's child support obligation.[1] But given the still "substantial disparity in the parties' incomes," the court found that its amended award would "help ensure Katherin's financial stability, mitigate the imbalance in disposable income, and enable her to maintain a

---

[1] Neither the dissolution decree nor the court's order on Eric's motion to reconsider complied with Iowa Court Rule 9.5(1)(a)(1). Under that rule, "[i]f spousal support is to be paid in the pending matter, whether temporary or permanent, *it will be determined first* and added to the payee's income and deducted from the payor's income *before child support is calculated*." Iowa Ct. R. 9.5(1)(a)(1) (emphasis added). The court instead added Eric's child support obligation to Katherin's net monthly income and deducted it from Eric's when reconsidering the amount of spousal support that should be awarded. Because neither party challenges this deviation from the child support guidelines, we do not address it on appeal.

4

standard of living reasonably comparable to that enjoyed during the marriage."

Eric appeals, and Katherin cross-appeals, from the spousal support award.

## II.     Standard of Review

"Because we are in equity, we review the district court's order concerning spousal support de novo." *Owen*, 29 N.W.3d at 10. Despite that de novo review, we give the district court "considerable latitude," disturbing its ruling only "when there has been a failure to do equity." *Id.* (cleaned up).

## III.    Analysis

Whether to award spousal support "is a matter of discretion and not a matter of right," and the decision "depends on the particular facts and circumstances of each case." *In re Marriage of Pazhoor*, 971 N.W.2d 530, 537 (Iowa 2022) (citations omitted). "The legislature has not authorized Iowa courts to employ any fixed or mathematical formula in applying spousal support." *Id.* at 538 (citation omitted). Instead, "courts are to equitably award spousal support by considering the criteria listed in Iowa Code section 598.21A(1)." *In re Marriage of Sokol*, 985 N.W.2d 177, 185 (Iowa 2023) (cleaned up).

### A. Eric's Appeal

Eric claims that in awarding Katherin traditional spousal support, the district court failed to consider the following factors in section 598.21A(1): paragraphs "*b*" (age and health), "*c*" (property distribution), "*d*" (educational level), "*e*" (earning capacity of party seeking support), and "*f*" (feasibility of party seeking support to become self-supporting). He argues

that when those factors are "properly considered and evaluated . . . this case, at best, supports an award of rehabilitative spousal support" of $2,000 per month for ten years. We disagree.

"An award of traditional spousal support is equitable in marriages of long duration"— generally those lasting twenty years or more—"to allow the recipient spouse to maintain the lifestyle to which he or she became accustomed." *Sokol*, 985 N.W.2d at 185. "[I]n marriages of relatively long duration," like this one, an award of traditional spousal support "is primarily predicated on need and ability." *In re Marriage of Gust*, 858 N.W.2d 402, 411 (Iowa 2015) (citation omitted). The yardstick for determining need is "the ability of a spouse to become self-sufficient at 'a standard of living reasonably comparable to that enjoyed during the marriage.'" *Id.* (quoting Iowa Code § 598.21A(1)(f)). As for the ability to pay, awards of both spousal support and substantially equal property distribution have been affirmed in long-term marriages, "especially where the disparity in earning capacity has been great." *Id.* (citation omitted).

In determining the spousal support issue, the district court considered Katherin's need for support and Eric's ability to pay—as well as the other factors that Eric contends were overlooked—finding:

> Throughout the marriage, Katherin primarily focused on homemaking and raising the couple's four children, homeschooling them for over a decade. This absence from the workforce significantly impacted her career opportunities and earning potential. While she has taken steps to re-enter the job market, her current earning capacity remains substantially lower than Eric's. Economic sacrifices made by a spouse who prioritizes domestic responsibilities justify spousal support.

> Conversely, Eric was able to advance his career without interruption. He has maintained stable, increasing earnings and now holds a high-level position at JE Dunn, with substantial salary growth, bonuses, and career prospects. While Katherin is pursuing further training and

certifications, there is no reasonable likelihood that she will achieve financial self-sufficiency at the marital standard of living. When a dependent spouse's financial future is uncertain, courts may award indefinite support to maintain a comparable standard of living.

. . . .

Eric has the financial capacity to provide support without undue hardship. His salary, bonuses, and retirement assets place him in a strong financial position. Courts have consistently awarded spousal support in cases with substantial income disparities, such as this one.

The Court must also consider long-term financial projections. Katherin is pursuing certifications in trauma recovery coaching and considering further education in counseling, but there is no evidence that her earnings will significantly increase. Meanwhile, Eric's income is expected to continue rising.

(Internal citations omitted.)

We agree with these findings on our de novo review of the record. Once the parties' first child was born, they agreed that Katherin would quit her job and stay at home. That arrangement enabled Eric's career growth while restricting Katherin's long-term earning capacity. *See Gust*, 858 N.W.2d at 410 ("[P]articularly in a traditional marriage, when the parties agree a spouse should stay home to raise children, the economic consequences of absence from the workplace can be substantial."). Although Eric points to Katherin's doula training and marketing degree as evidence of her earning capacity, the court reasonably found those qualifications insufficient to allow her to achieve a standard of living comparable to that enjoyed during the marriage—especially considering that she remains the children's primary caregiver. *See* Iowa Code § 598.21A(1)(e) (considering the earning capacity of the party seeking support, including "responsibilities for children under either an award of custody or physical care").

And while Eric lacks a college degree, that has not impacted his earning capacity, as he seems to assert on appeal. He built a highly successful career in the construction industry through on-the-job training and experience, earning an income that exceeds what Katherin has been able to achieve despite her degree. There was no evidence of reeducation, retraining, or any defined plan that would allow Katherin to become self-supporting. *See Sokol*, 985 N.W.2d at 186 ("Without a showing that the recipient spouse seeks reeducation, retraining, or some discrete period of time to increase earning capacity to become self-supporting, rehabilitative spousal support is inappropriate."). In this context, the comparison Eric draws between formal educational credentials is immaterial.

We have also considered Eric's assertion that he will have to "dramatically change his standard of living" because of the spousal support ordered by the district court. That assertion carries little weight considering that he has not challenged the amount of the award—just its length. And, as our supreme court has recognized, "it may be that neither party will be able to maintain their marital lifestyle" because "two households are inevitably more expensive to maintain than one." *Gust*, 858 N.W.2d at 415; *accord Owen*, 29 N.W.3d at 8. Katherin seemed to recognize this, testifying that she tried "to live as cheaply as possible" by buying the children secondhand clothes and off-brand food. She was prepared to cut additional expenses after the divorce, including by reducing her entertainment and gift budget. Under these circumstances, Eric's push for rehabilitative spousal support fails. We accordingly affirm on his appeal.

### B. Katherin's Cross-Appeal

As for Katherin's cross-appeal, we reject her challenge to the amount of spousal support awarded by the district court. Focusing on the gap

between her net monthly income before child support and household expenses, Katherin contends that "if there is any inequality" in the spousal support award, it should be in her favor because she is "the party responsible for all the children's expenses" and the one "most likely to find herself in need of additional funds." The court considered these issues in its post-decree order granting Eric's motion to amend and reducing the amount of his spousal support obligation.[2] In doing so, the court discussed the parties' reported monthly expenses and net monthly incomes, along with Katherin's continued role as the children's primary caregiver, lack of liquid assets, and her receipt of $2,949.01 per month in child support. After balancing those considerations, the court found it was equitable "to amend Eric's monthly spousal support obligation to $2,000." We agree.

Although our review is de novo, "we afford deference to the district court for institutional and pragmatic reasons." *Sokol*, 985 N.W.2d at 182 (citation omitted). That deference "counsels against undue tinkering with

---

[2] The court's order on Eric's motion to enlarge, amend, or reconsider was captioned "ORDER (Post-Trial Motions)" and discussed legal principles under Iowa Rule of Civil Procedure 1.904(2). However, in the decretal portion of the order, the court stated the dissolution decree was "amended nunc pro tunc." Seizing on that phrase, Katherin argues the court "erred in granting Eric's motion to enlarge in the form of a nunc pro tunc order." We reject that argument because it is clear the court was ruling on Eric's motion under rule 1.904(2) and not issuing a nunc pro tunc order.

Katherin relatedly claims the court erred in "retroactively modifying the dissolution decree" through a nunc pro tunc order that reduced Eric's spousal support obligation to "$2,000 per month, effective as of the date the Decree was entered." But the court's order did not contain an effective date for the reduction, and neither party asked the court to address that issue. As a result, we find that error was not preserved. *See In re Marriage of Dauterive*, No. 20-0382, 2021 WL 1017121, at *2 (Iowa Ct. App. Mar. 17, 2021) (finding error was not preserved on a challenge to the effective date for a revised child support obligation where the court's ruling "did not mention the issue").

spousal support awards." *Id.* Because we find no "failure to do equity" with the amount of spousal support awarded by the court, we affirm on Katherin's cross-appeal. *See id.* at 182–83 (noting that "when appellate courts unduly refine these important, but often conjectural, judgment calls, they thereby foster appeals in hosts of cases, at staggering expense to the parties wholly disproportionate to any benefit they might hope to realize" (cleaned up)).

Finally, we deny Katherin's request for appellate attorney fees, which "are not a matter of right, but rather rest in this court's discretion." *In re Marriage of Okland*, 699 N.W.2d 260, 270 (Iowa 2005). Given the relative merits of the parties' appeals, we conclude that each party should be responsible for their own attorney fees. *See id.* Costs on appeal are assessed equally to each party.

**AFFIRMED ON APPEAL AND CROSS-APPEAL.**